Lomat University College of Law, and I can see we have an eager and anxious audience waiting to hear the terrific arguments that we're about to hear. We have an interesting array of cases to be heard today. We have cases coming to us from two different district courts. We have a case coming to us from the Patent Office, and another case coming to us from the Merit Systems Protection Board. In addition to those four argued cases, we have two other cases that will be decided on the briefs. For the record, that's case number 2011-3037, Exum v. DHS, and 2011-1275, In re, Taylor, another appeal from the Patent Office. With that, we'll hear argument in the first case, appeal number 2010-1526, DOW CHEMICAL v. NOVA CHEMICALS. Mr. Dunner, good afternoon. Welcome. Good afternoon, Your Honor, and may it please the Court. Contrary to the district courts' and DOW's positions, the standing issue doesn't turn on the content of any documents, content of any schedules, and for that matter, it doesn't turn on any credibility determinations. While the district court held that no assignment could take place unless the patent was listed on Schedule A, that holding is clearly inconsistent, I submit, with three portions of the contribution agreement, paragraphs 201, 107, and 907. Mr. Dunner, you're in a difficult position, it seems to me, to be arguing standing, given that the parties to the contract, I mean, in a typical case, we're here because the two parties to the contract are arguing different positions. Here, the two parties' interests are aligned, and their position is similar with respect to what they intended in the contract. Am I right about that? Their positions are similar, but with due respect, Your Honor, I don't think I'm in a difficult position, and let me explain why. This contract, the contribution agreement and the PTLA, were designed to put in the hands of one company, DGTI, the control of all of the patents and related technology. It was also designed to obtain tax benefits for Dow, and Dow, in fact, paid over a billion dollars to DGTI, and paid $68 million on the patents and suits. And so, they can't have their cake and eat it, too. They got these benefits, and they have to be willing to accept the detriments of their agreement. Well, does your position rest, therefore, on the fact that the contract was absolutely clear and unambiguous? That is my position. And if we were to find, however, that we disagreed, and that, at minimum, there was ambiguity, the district court found there was no ambiguity because it went the other way. But let's assume we were to find there were ambiguity. Where would that leave us with respect to where we're at? Your Honor, it would leave us in exactly the same place because there is a document in the record that I think is a blockbuster. It's on pages A5663 and 5664, and what it is is a series of emails exchanged between the representatives of Dow who were preparing the contribution agreement. And these documents make clear that Dow's position on what the contract means is absolutely inconsistent with what the parties intended. These two pages are a series of documents generated on January 27th and January 28th, 2002, less than a week before the agreements were signed. And they make clear that Dow's argument that the loss of rights provision, which is one of its principal arguments, was not designed to deal with potential litigation. It was designed to deal with pending litigation. Well, except, as is true with respect to every provision you've cited so far, there are two different views on what those emails actually say. The other side would say to that, for instance, that the emails clearly talk about bringing and maintaining a lawsuit, and therefore they should be interpreted as not dealing exclusively with pending litigation. So I take your argument, but as far as it being a blockbuster, I think one has to admit that there's another side to this that could arguably make even that ambiguous. Am I wrong? I think you are, Your Honor. It does say bringing and maintaining the lawsuit, but what it provided was it talked about the issue with standing. There's not a single word here about lost profits, which is one of their bigger arguments. There's discussion in these emails about the fact that the PTLA agreement provided for assignment back to Dow in the event that they needed it to bring a lawsuit. In fact, that's a provision of the PTLA agreement, which actually ultimately ended up in that agreement. This document continually talks of standing. It continually talks about for suits that are already pending, it would make it simpler to have the patents just remain with Dow. It repeats that over and over again, and it says that as a safety net, they will have a schedule of excluded intangible rights, which is the D, which is Schedule D. And in fact, the original Schedule D, which was the only one of the schedules that was signed within the 90-day limits of these agreements, did not exclude the patents in suit. So all I'm saying is I think if you read these emails carefully, as I know you will, I think you should, whether you will is another matter, I think you should end up agreeing with me. In one of the emails, and this is at A5663 at the top of the page, an email from Noreen Warwick. She says, I've addressed this issue in the contribution agreement by excluding patents that can't be transferred to DGTI without a loss of rights. Exactly. Is it your contention that that word loss of rights is a reference to the loss of rights that's addressed in the overall agreement? That is my position, and I think that's a very significant element of these documents. In fact, the grant-back provisions of the PTLA actually use the words loss of rights as well, and they talk about assignment back to Dow in case they have a standing problem. The whole issue is standing, and they wanted to deal with the pending litigation at this time, and if there was any future litigation, the grant-back provision would have provided for that. That's exactly our position. Is there anything in the agreement, the contribution agreement, that explains what loss of rights means in paragraph 1.07? There is nothing in that agreement that explains what loss of rights means. But on the other hand, clearly, if you look at the agreements as a whole, it is my position that what was designed to be transferred was any and all patent rights and other rights that they were able to assign. They ended up saying that subject to three conditions, and only three conditions, Schedule A was not one of those three conditions. It followed the three conditions. I agree with you there. I think Schedule A is a separate sentence, and to me, it's not linked to the assignment or anything else. But that phrase, loss of rights, is a curious phrase that's thrown in there at the end of the three conditions and seems to have at least some ambiguity. Your Honor, if it does have ambiguity, I think it is resolved by 5663 and 64. But I think, as our position... There's nothing in the actual agreement that incorporates any explanation or any of those... There's nothing in the agreement that says loss of rights means X. But it is clear that it was designed to assign... The very first item in what is assigned were the U.S. patent rights. It's the very first item, twice, in the PTLA and in the contribution agreement. And it says any and all U.S. patent rights other than these three conditions. Dow's theory is that this Schedule B supplement, which this Court found was Schedule A, has only four U.S. patents, which existed in 2002. It is inconceivable, to me at least, that a document that says we're going to assign any and all documents except those that would result in a loss of rights, would end up with four out of 7,300 U.S. patents, which existed at the time. So I say the agreement itself has blaze marks in it that lead to this conclusion. I agree. There is no paragraph that says loss of rights means X. But I think that when you read the agreements as a whole, you cannot come to the conclusion that potential litigation, which is what they argue it is, is the result. Is it your view that the sentence in which that phrase appears suggests some meaning for loss of rights? In the sense that it says all patents can be assigned... What paragraph are you looking at, Your Honor? Paragraph 1.07, right in the middle of that paragraph. Yes. It's talking about, well, all patents will be assigned, all patents that DTCC is able to assign to DGTI. And then there are three separate clauses that follow. One, without the consent of a third party. Two, without diminishing the royalties paid, etc. And three, without resulting in a loss of rights. Is there anything in your view that suggests a meaning for loss of rights by virtue of the parallelism there? Or the fact that there are these other companion phrases in that sentence? Other than the fact... I'm just looking for some guidance. I understand, Your Honor. Other than the fact that when somebody is transferring any and all patents of any kind, and the first list is U.S. patents, for somebody to say that that means four out of 7,300 is improbable on its face, that's to start with. Secondly, the PTLA and the contribution agreement were decided on the same day. And the provision about the grant back, dealing with if Dow needs to have title in order to sue, and using the word loss of rights, suggests that it's tied to Dow wanting to sue. But it certainly doesn't lead to the conclusion that out of 7,300 patents, only four are going to be transferred. And there's a separate problem. The problem is that the district court relied on Schedule B supplement as Schedule A. That document was amended as late as December 2005. The suit was filed in October 2005. You cannot tell from this record what was on that schedule at the time the suit was filed. Moreover, there are 23 patents that are on Schedule B supplement, and also on both Schedules D. Schedules D are those that are excluded. Schedule A are those that are included. These documents are inherently untrustworthy. The burden is on Dow to prove its case on standing. And I submit all of the elements that I have talked about lead in the direction that they did not have standing, that they did not prove their case, and that therefore this case should be dismissed.  Prejudice because of Lalande's case, which in fact was dismissed with prejudice on a standing issue. They cite a case, University of Pittsburgh versus Varian Medical, it's a Federal Circuit 2009 case, which says that we look with dismissals with prejudice as not favored. But that case also says that if there was contumacious conduct or delay, that then it could be dismissed with prejudice. And we have outlined in our brief that not only was there a delay, but we had to pull teeth to get all the documents we're talking about. Let's assume it's not dismissed with prejudice. Where does that leave you? With an assumption that it goes back to the district court and they try to join the other party in the suit, or we have to refile the suit? Or have a new suit refiled. That's exactly right. That's what would happen if it wasn't dismissed with prejudice, subject to a potential loss of rights because there's a six-year damages provision and there could be a damages cutoff. There could be a cutoff for what the damages theories are and what have you. Would you like to retain your remaining time for rebuttal? I would, Your Honor. Mr. Roper? Thank you very much, Your Honor. Good afternoon. Thank you. I think I'll concentrate on the standing issue, if I might. I think obviously the question is whether there was a transfer and it was controlled by the contribution agreement. I would start out by saying that if everything was as confusing as Mr. Dunner suggests, and that the contribution itself, contribution agreement just failed, then, of course, there would be no transfer at all. Dow would own the patents and standing would be appropriate. And in that regard, I think it's important that the case is different than, I think, the Tyco case that was cited somewhere along the line where the opposite was true. I do think, though, the agreement is pretty clear that it transfers any and all patents and applications of any kind. And then there are these few exceptions, including this provision we're talking about with the loss of rights. So I think a lot of the dispute really does center on what the meaning is of this phrase, loss of rights. Yes, and I agree. I think that's true. And I do think it's also important to keep in mind that there is nothing in the contract that uses patent rights or patents, lowercase patents, to say that all patents are transferred. The only thing that is ever transferred is the capital P, capital R patent rights that are expressly defined in that definitional provision. So there's nothing else in here vis-a-vis patents that are transferred. There's a lot of other things that are transferred. But as far as patents go, it's always only what is in that definition. And one of the things, as you say, is you're not going to transfer patents that involve a loss of rights. Now, the district court, who held a trial on all of this and considered everything that Mr. Dunner mentioned, found that Schedule A, which is, as you mentioned, in that same paragraph that defines patent rights, it's the sentence in that paragraph, that is where Schedule A is referred to in a definitional sense. So I think the intention there... But the sentence there just says the parties shall provide a schedule.  And 9.07, I think, is quite clear on the schedules. It incorporates the schedules by reference. And it says, boy, these schedules are important. And if there's any error on those schedules, the parties have to get together and amend them to correct them. So 9.07... Well, Mr. Dunner's point that the schedule... It's impossible at this point, in using hindsight, to ascertain what was on that schedule in 2005. Okay, that's... All right, on that question, no, I think that's incorrect. We have a Schedule A that is, indeed, in the appendix. It's the one that... Did the district court make any findings? I know he made a finding with respect to the typo on Schedule A, Schedule B. Yes, he did. Did he make any findings with respect to what, at the relevant time periods, was actually included on Schedule A? Yes, he did. He found that these patents in suit were never on Schedule A. As a matter of fact, these patents were not on Schedule A, so Dow always owned them and owned them during all the relevant time periods. What about Mr. Dunner's point about, if you just step back, reality and credibility lead you to conclude that it can't be that there are only four patents out of 7,300 or whatever the number is that would have been included in this broad wording? Okay, that's... First of all, that's not correct. The vast majority, thousands, of foreign patents were put on that schedule. Thousands of foreign patents were put on that schedule. And, as far as we know, the foreign patents don't have this issue of collecting damages for lost profits for a manufacturing entity, which is the thing that I think concerned all these lawyers. Don't put these U.S. patents on there because you're going to lose rights if you sue somebody. You're going to lose your right to collect lost profits if you put a patent on there. That's why, for the pre-2002 patents, only four patents were put on Schedule A. They were very, very careful about that. In that regard, let me make this point about those e-mails that preceded the agreement. First of all, they did precede the agreement. And they were discussions of ideas that might possibly have been implemented, but they weren't implemented. What does the word or the term loss of rights mean in those e-mails? What was he referring to? I think it was trying to get at the idea that there might possibly – it reflected that same concern. In other words, that concern was, well, when we have these patents, especially these U.S. patents, there's a lot of rights involved, like the rights to lost profits, and we might lose those. We don't want to do that. But Mr. Dunner is absolutely wrong that the language of those e-mails or the idea of those e-mails was actually implemented in the contribution agreement for this reason. He says those e-mails show that only pending litigation patents were to be excluded. That's what he said. In other words, if they're in pending litigation, we want to exclude them. That was his position. And he said they're going to be put on Schedule D. Well, in fact, Schedule D is in the appendix. It's got 158 patents on it. There were only eight patents in litigation. So it makes absolutely no sense what he was saying. That is absolutely incorrect. In fact, the idea expressed by Noreen Warwick in those e-mails was not implemented when they finally got to the agreement. And, in fact, if I ---- I thought you were going to argue that Section 901 says you've got to ignore everything other than the terms of this agreement, right? Well ---- Isn't that one answer to the reference to the e-mails, that the agreement itself ---- Yes, there is a ---- No all prior contemporaneous representations, understandings, blah, blah, blah, are out the window. Exactly. And the agreement holds. Exactly. So is it your argument that the e-mails should not be considered at all? Yes. Outside of the document? Absolutely. So then what happens if we, at the end of the day, disagree with the district court judge and think there is at least some ambiguity in the terms of the agreement? Where does that leave us? Well, I think the ---- If I understood the discussion so far, it was that there might be some ambiguity over the idea of loss of rights. Now, so I would suggest that you look at it this way, if you were to conclude that. The place where loss of rights appears is in the definition of patent rights. We know that. And we know that Schedule A is referred to in that same paragraph. So I believe that if you want to try to figure out what was going on in that regard, then this is what was going on. As I said, there is a lot of rights associated with patents, and there is a lot of patents that Dow owns, a lot of U.S. patents, thousands and thousands and thousands of patents with a lot of rights associated with them. So there is a little, you might say, I wouldn't say it's ambiguity myself. I mean, I would say this thing is perfectly clear. But there's a little bit of fuzziness around the term loss of rights. Schedule A is what makes it absolutely definite. In other words, it says you've got to put the patent on Schedule A. The number, the patent number has got to be on Schedule A. In order for it to be transferred, that will end any indefiniteness. That makes this thing crystal clear. Paragraph 1.07 does not say patent rights means any and all patents listed on Schedule A. It says patents means any and all patents and applications, et cetera, et cetera, that we are able to convey. And then separate sentence, the party shall provide a schedule. Yes. And I think so if you say, if you want to say, well, I look at that and it's not crystal clear, then I think the best understanding, the best implementation, the best way to resolve the issues to carry out, you might say what that contract really was intended to carry out, is to say that Schedule A was specifically there in order to make it very, very definite. So to take any ambiguity or unfuzziness or indefiniteness out of the idea of schedule of loss of rights and make this- Well, that's essentially what the district court said. Yes, that's right. Or is that anything different than what Judge Farnan said? No, that is essentially what Judge Farnan said. It's also true that Judge Farnan held the trial and he said, I've looked at all their course of conduct evidence and I don't see anything in it that changes the unambiguous meaning of this contract, and in particular, the meaning of Schedule A. So I think that he undertook that task. He thought it was unambiguous. Actually, they always took the position that it was unambiguous. Well, isn't that a little inconsistent? I mean, how do you have it both ways? He found the contract was clear and unambiguous, and then he says, but when I look at the other evidence, it makes it clear and unambiguous, the extrinsic evidence, the other evidence? No. No, he doesn't say that. He says, I find it unambiguous. These people want a trial. They asked me for it. We were doing discovery on this issue during the entire trial in America. He says the evidence does not render, alter the fact that it's plain and unambiguous. That's correct. That's right. Isn't there a little tension there? Well, there is authority. In fact, they cited a footnote in their reply brief, a New Valley case, which is a Third Circuit case, and he's in the Third Circuit, which suggests that perhaps you can do it. You can consider the extrinsic evidence for a very limited purpose, only to determine whether or not the contract is ambiguous or not. It sounds like the tail wagging the dog today. He's sitting there as a Third Circuit judge, and he's saying, you know, maybe I better follow what they tell me. So he says, they insist on having a trial. They're knocking on my door saying, you've got to give me a trial on this issue. He says, okay, we'll have a trial. So he gives them a trial. He says, I listened to all that evidence. It doesn't change anything. Do we review his findings to the extent that's a finding with respect to the extrinsic evidence? Do we review that for clear error? I think you do review that for clear error, although I do think that obviously I think on the question of ambiguity, whether this is an ambiguous contract or not, that question is a question of law for the court. But I think that on that other swerve into that area, I think that he heard four live witnesses. He heard all that deposition testimony. And I think you are entitled to give deference to the court on that. Counsel, what was the purpose of the quit-claim agreement that's in the record? During the course of litigation, one of the lawyers at Dow, the litigation lawyer in charge of the case, found the contribution agreement and decided that we have to deal with this. So we turned it over to NOVA. Now, by that time, we knew how it was. If your claim is that the patents never did transfer, why was there a quit-claim agreement effectively trying to detransfer or assign back the patents? For this reason, Judge, it was saying NOVA has been so aggressive in this litigation, they're going to do everything they possibly can do. And I suppose there is some remote chance that some court might find against us on this. So we'll transfer it back. And if that's the case, then we could refile the case without prejudice. That's the purpose of the quit-claim. But I think the most important part of that thinking, Judge Reyna, is that Dow also could have refiled at that time. But they didn't. We were confident. That the ultimate resolution of this issue would be that Dow owned the patents and they were not transferred. Well, there would have been some difference, would there not? If you refiled in 2009, you would have lost the six years of damages, right? Or they would have affected the period of damages in which you could get. There might very well have been a question on the images. Absolutely, Your Honor. There's no question. Also, in response to Judge Reyna's question, you said you knew these guys were going to come in and throw everything in. But you didn't do the quit-claim. How does the timing work on that? Because the quit-claim was 2009. You filed the suit in 2004, right? Right. And the due diligence that the lawyer, Bruce Canuck, conducted before bringing the original lawsuit is largely in the record. And he testified at trial. It's a subject of material in the appendix and in the briefs. So what he did was this. He looked he contacted people who were familiar with Schedule A and the contribution agreement. They were familiar with Schedule A. But that's not what was in his mind. He used what is called the IPMS database. And the IPMS database is a comprehensive database that Dow maintains that includes all information, including ownership information. It includes all the information that would be on Schedule A, plus additional information. So he was quite confident that when he filed this lawsuit, since IPMS said Dow owns it, that standing was appropriate. Thank you very much. Thank you, Mr. Roper. Mr. Dunner, you've got a little time for rebuttal. How much time do I have, Your Honor? A minute and a half. Okay. First, very quickly, Section 901, which Judge Prost referred to and which Mr. Roper talked about saying why you can't look at the e-mails, he's basically suggesting that this document prevents you from looking at anything suggesting the intent of the agreement. That can't possibly be. I submit that paragraph was not designed to do that. Section 907 says that if something is omitted or included in an agreement, it won't change the basic rights under the agreement. So the focus on these documents is just not accurate. The IPMS database was not updated after the contribution agreement. The record makes that absolutely clear. Reliance on that. Judge Rayner's focus on the quitclaim assignment. I think it's clear what the quitclaim assignment was. Dow was worried about what the state of affairs was. And Dow has been backfilling from the beginning of this suit to the end. The only document that was prepared within the time limit, the 90 days, was Schedule D. And that didn't exclude the patents and suit. They had a Schedule A, which wasn't prepared until 2009. They had a Schedule B supplement, which was prepared during the years and amended after the suit was filed. Everything smells to high heaven, Your Honors. I don't think the schedules are reliable at all. And I think the agreement is clear on its face and leads to the conclusion that there is no standing here. What is your response to Mr. Roper's comment about Schedule D, including not simply the eight patents that were in litigation, but over 100 other patents? Your Honor, I don't have a response. I don't know the answer to that question. All right. Very good. Thank you. I thank both counsel. The case is submitted.